# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNSYLVANIA STATE CONFERENCE OF
THE NAACP, *et al.*,

                    *Plaintiffs,*

     v.

AL SCHMIDT, in his official capacity as Acting
Secretary of the Commonwealth, *et al.*,

                    *Defendants.*

Case No. 1:22-cv-00339-SPB

## BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

BACKGROUND ............................................................................................... 4

   A.   Pennsylvania Expands Mail Ballot Voting ............................................. 4

   B.   Litigation Ensues Over the Envelope-Date Requirement ............................. 6

   C.   Thousands of Pennsylvanians Are Disenfranchised in the 2022 General Election Based on the Envelope Date Requirement ................................................. 8

   D.   Disenfranchised Voters and Non-Partisan Groups File This Action ............. 13

ARGUMENT ................................................................................................. 14

I.   PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR MATERIALITY PROVISION CLAIM ...................................................................................... 14

   A.   The Materiality Provision Prohibits Disenfranchising Voters Based on Inconsequential Paperwork Errors ..................................................... 14

   B.   On the Undisputed Facts in the Record, Defendants Violated the Materiality Provision .................................................................................... 17

     i.   Pennsylvania voters were denied the right to vote ......................... 17

     ii.   … based on an "error or omission" on a "record or paper relating to … [an] act requisite to voting" … ............................................................. 18

     iii.   … that is "not material in determining whether such individual is qualified under State law to vote in such election." ............................................. 19

II.   PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR FOURTEENTH AMENDMENT CLAIM. ................................................................................ 23

CONCLUSION ............................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Belitskus v. Pizzingrilli,*
  343 F.3d 632 (3d Cir. 2003) ..................................................................... 14

*Berckeley Inv. Grp. Ltd. v. Colkitt,*
  455 F.3d 195 (3d Cir. 2006) ..................................................................... 14

*In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen.*
  *Election,* 241 A.3d 1058 (Pa. 2020) ........................................................... 6

*Chapman v. Berks Cnty. Bd. of Elections,*
  No. 355 M.D. 2022, 2022 WL 4100998 (Pa. Commw. Ct. Aug. 19,
  2022) .......................................................................................................... 7

*Condon v. Reno,*
  913 F. Supp. 946 (D.S.C. 1995) .......................................................... 16, 18

*Doe v. Pennsylvania Bd. of Prob. & Parole,*
  513 F.3d 95 (3d Cir. 2008) ....................................................................... 23

*Dunn v. Blumstein,*
  405 U.S. 330 (1972) .................................................................................. 23

*Fla. State Conf. of N.A.A.C.P. v. Browning,*
  522 F.3d 1153 (11th Cir. 2008) .................................................... 15, 16, 20

*Ford v. Tennessee Senate,*
  2031, 2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006) ........................... 16, 18

*La Union del Pueblo Entero v. Abbott,*
  604 F. Supp. 3d 512 (W.D. Tex. 2022) ..................................................... 20

*League of Women Voters of Ark. v. Thurston,*
  No. 20-CV-05174, 2021 WL 5312640 (W.D. Ark. Nov. 15, 2021) .................. 15, 16

*Martin v. Crittenden,*
  347 F. Supp. 3d 1302 (N.D. Ga. 2018) .............................................. 16, 20

*McCormick for U.S. Senate v. Chapman,*
  No. 286 M.D. 2022, 2022 WL 2900112 (Pa. Commw. Ct. June 2,
  2022) .......................................................................................................... 7

*Migliori v. Cohen,*
    36 F.4th 153 (3d Cir. 2022) ............................................................*passim*

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) .................................................. 23, 24, 25

*Obama for Am. v. Husted,*
    888 F. Supp. 2d 897 (S.D. Ohio) ........................................................... 23

*Obama for Am. v. Husted,*
    No. 12-cv-636, 2014 WL 2611316 (S.D. Ohio June 11, 2014) ............................. 24

*Peters v. Lincoln Elec. Co.,*
    285 F.3d 456 (6th Cir. 2002) ............................................................. 23

*Polychrome Int'l Corp. v. Krigger,*
    5 F.3d 1522 (3d Cir. 1993) ................................................................. 3

*Ritter v. Migliori,*
    142 S. Ct. 1824 (2022) ..................................................................... 7

*Ritter v. Migliori,*
    143 S. Ct. 297 (2022) ...................................................................... 7

*Schwier v. Cox,*
    340 F.3d 1284 (11th Cir. 2003) ........................................................... 15

*Schwier v. Cox,*
    412 F. Supp. 2d 1266 (N.D. Ga. 2005) ..................................................... 20

*United States v. Munsingwear, Inc.,*
    340 U.S. 36 (1950) ......................................................................... 7

*United States v. Williams,*
    124 F.3d 411 (3d Cir. 1997) .............................................................. 24

*Washington Ass'n of Churches v. Reed,*
    492 F. Supp. 2d 1264 (W.D. Wash. 2006) ................................................... 20

**Statutes**

25 P.S. § 2602(z.5)(3) ......................................................................... 4

25 P.S. § 3146.1 ............................................................................... 4

25 P.S. § 3146.2 ............................................................................... 4

25 P.S. § 3146.2 ................................................................................................ 4

25 P.S. § 3146.2b ........................................................................................... 4, 5

25 P.S. § 3146.3 ................................................................................................ 4

25 P.S. § 3146.4 ................................................................................................ 4

25 P.S. § 3146.5 ................................................................................................ 4

25 P.S. § 3146.6 ................................................................................................ 4

25 P.S. § 3146.6(a) ..................................................................................... 5, 6, 21

25 P.S. § 3146.6(b) ........................................................................................... 5

25 P.S. § 3146.6(c) ..................................................................................... 5, 6, 21

25 P.S. § 3146.7 ................................................................................................ 4

25 P.S. § 3146.8 ................................................................................................ 4

25 P.S. § 3146.8(g)(4) ..................................................................................... 4, 5

25 P.S. § 3146.9 ................................................................................................ 4

25 P.S. § 3150.12b ........................................................................................... 4, 5

25 P.S. § 3150.16(a) ........................................................................................ 5, 6

25 P.S. § 3150.16(b) ........................................................................................... 5

25 P.S. § 3150.16(c) ..................................................................................... 5, 6, 21

25 Pa. C.S. § 1301(a) ..................................................................................... 4, 20

25 Pa. C.S. § 3509 ........................................................................................... 25

25 Pa. C.S. § 3511 ........................................................................................... 25

25 Pa. C.S. § 3515(a) ..................................................................................... 3, 24

28 U.S.C. 1746 ................................................................................................ 23

52 U.S.C. § 10101(a)(2)(B) ........................................................................... *passim*

52 U.S.C. § 10101(a)(3) ................................................................................ 17

52 U.S.C. § 10101(a)(3)(A) .................................................................... 18

52 U.S.C. § 10101(e) ...................................................................... 17, 18

52 U.S.C. § 20301 ................................................................................ 24

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................ 14

**Other Authorities**

Act of Oct 31, 2019, P.L. 552, No. 77, § 8 ............................................ 4

H.R. Rep. No. 88-914 (1963), *reprinted at* 1964 U.S.C.C.A.N. 2391 ......................... 15

## INTRODUCTION

Last November, thousands of Pennsylvanians were denied the right to vote based on a meaningless paperwork error.  All were registered, eligible voters whose mail ballot applications had been approved by their county boards of elections.  All undisputedly filled out their mail ballots during the proper statutory period, signed the form on the return envelope, and timely returned the package by the close of the polls on Election Day.  Yet those voters all had their ballots set aside and not counted because they omitted an inconsequential handwritten date on the return-envelope form, or else wrote some date that election officials deemed to be "incorrect."

The Materiality Provision of the Civil Rights Act prohibits denial of the right to vote based on such immaterial mistakes on voting-related paperwork.  It provides that the right to vote may not be denied based on an "error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).

This case presents a textbook violation of the statute:  Pennsylvania voters were denied the right to vote based solely on an inconsequential "error or omission" on a voting-related "record or paper" (namely, the form printed on the mail ballot return envelope).  In discovery, defendants all conceded that the handwritten envelope date has no bearing on whether a voter is "qualified under State law to vote," 52 U.S.C. § 10101(a)(2)(B), which in Pennsylvania is determined based on a person's age, citizenship, county and duration of residence, and incarceration status.  All of

those qualifications are confirmed by the county boards of elections when they approve a voter's application for a mail ballot, and none are affected by a date that a voter writes on an envelope.  Defendants also conceded that the handwritten date has no bearing on whether a ballot was timely completed and submitted:  A mail ballot is timely based on when it is actually received by the board of elections, and all mail ballots are date-stamped or otherwise logged upon receipt, regardless of any voter-written date on the envelope.

Indeed, the record shows that the voter-written date is so meaningless that, in trying to set aside mail ballots with purportedly "incorrect" envelope dates, counties repeatedly made arbitrary and inconsistent decisions about which ballots to exclude. A number of defendant counties disenfranchised voters based on envelope dates that were apparently "right," for example where a voter wrote "October 8" but omitted the year, or where they appear to have written the date using the international format, with the day listed before the month, such as "1/11/22."  Counties also refused to count ballots with obvious misprints (like "2033" or "2202" instead of "2022," or a birthdate from 80 years ago) even though county officials conceded that the voters could not possibly have voted from years past or future.  Meanwhile, some counties *counted* ballots where the voter-written date was necessarily "wrong," for example where the voter wrote a date that occurred before the mail ballot package had even been mailed out, or where a voter wrote "September 31"—*a date that literally does not exist.*

On materially identical facts, a unanimous Third Circuit panel held less than a year ago that disenfranchising voters based on the envelope-date requirement

would violate federal law.  *See Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *vacated as moot*, 143 S. Ct. 297 (Mem) (2022).[1]  Nothing has changed that would warrant any different result here.  No one has offered, through discovery or otherwise, any basis to conclude that the errors or omissions for which thousands of voters lost their fundamental right to vote last November are anything more than meaningless paperwork errors.  "The right to vote is 'made of sterner stuff' than that."  *Id.* at 163. On the undisputed facts in the record, Plaintiffs—lifelong voters from both political parties whose right to vote was denied, and non-partisan groups who scrambled to mitigate the damage from mass disenfranchisement and who will be forced to do so again—are entitled to judgment as a matter of law.

Granting judgment on Plaintiffs' statutory claim also avoids a clear Equal Protection Clause violation.  State law protects overseas voters from disenfranchisement based on trivial paperwork errors like the one for which Plaintiff voters had their ballots set aside.  25 Pa. C.S. § 3515(a).  Several counties in fact gave differential treatment to identically situated sets of voters—disenfranchising domestic mail voters based on the envelope-date issue, while accepting the ballots of overseas voters even when their analogous form declarations were not dated.  There is no valid reason for this unequal treatment.

2022 should be the last time Pennsylvanians face disenfranchisement for this irrelevant paperwork mistake.  Plaintiffs' motion should be granted.

---

[1] *Migliori* was vacated as moot but remains "persuasive" authority.  *E.g.*, *Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 (3d Cir. 1993).

## BACKGROUND[2]

### A. Pennsylvania Expands Mail Ballot Voting

Pennsylvania has long provided absentee-ballot options for certain voters who cannot vote in person on Election Day.  *See* SMF ¶ 1; 25 P.S. §§ 3146.1-3146.9.  In 2019, Pennsylvania expanded mail voting, allowing all registered, eligible voters to vote by mail.  SMF ¶ 2; *see also* Act of Oct 31, 2019, P.L. 552, No. 77, § 8.

A voter seeking to vote by mail must complete an application to enable county election boards to verify their identity and qualifications.  In particular, the voter must provide their name, address, and proof of identity to their county board of elections.  SMF ¶ 5; 25 P.S. §§ 3146.2, 3150.12.  Such proof of identity must include a Pennsylvania driver's license number, if the voter has one, or else the last four digits of the voter's social security number.  SMF ¶ 5; 25 P.S. § 2602(z.5)(3).

After the application is submitted, county boards of elections confirm applicants' qualifications by verifying their proof of identity and comparing the information in the application with information in a voter's registration record.  SMF ¶ 6; 25 P.S. §§ 3146.2b, 3150.12b, § 3146.8(g)(4).  This process allows the boards to verify that the voters are qualified to vote in Pennsylvania—namely, that they are at least eighteen years old, have been a U.S. citizen for at least one month, have resided in the election district for at least thirty days, and are not incarcerated on a felony conviction.  SMF ¶¶ 4–7; *see also* 25 Pa. C.S. § 1301(a).  A county board's

---

[2] The below facts are drawn from Plaintiffs' Rule 56.1 Statement of Material Facts ("SMF") and the accompanying Appendix ("APP_"), unless otherwise noted.

determinations are conclusive by law, absent a successful challenge brought before Election Day.  SMF ¶ 8; 25 P.S. §§ 3146.2b, 3150.12b, § 3146.8(g)(4).

After a board verifies the voter's identity and eligibility, it sends them a package that contains a ballot, a "secrecy envelope," and a pre-addressed outer return envelope, on which a voter declaration form is printed (the "Return Envelope").  SMF ¶¶ 7, 8; 25 P.S. §§ 3146.6(a), 3150.16(a).  Counties keep records of who has requested and returned a mail ballot.  25 P.S. §§ 3146.6(b)(1), (3), 3150.16(b)(1), (3).  Different counties send the mail-ballot package to voters at different times.  SMF ¶ 34.  In 2022, some counties sent the mail-ballot package out as early as mid-September, but more than half began sending them to voters in October, with the latest sending their packages beginning on October 21.  SMF ¶ 34.

At "any time after receiving" their mail-ballot package, the voter must mark their ballot, put it inside the secrecy envelope, and place the secrecy envelope in the Return Envelope.  SMF ¶ 10; 25 P.S. §§ 3146.6(a), 3150.16(a).  The voter must then deliver the ballot, in the requisite envelopes, to their county elections board.  *Id.*  To be considered timely, a county board of elections must receive a ballot by 8 p.m. on Election Day.  SMF ¶ 11; 25 P.S. §§ 3146.6(c), 3150.16(c).

Upon receipt, county boards of elections stamp or otherwise mark every Return Envelope with the date to confirm its timeliness and enter this information in the Statewide Uniform Registry of Electors ("SURE") system, Pennsylvania's voter registration system.  SMF ¶ 12.  The timeliness of the voter's ballot is determined by when it was received and stamped, not based on any handwritten date.  SMF ¶¶ 11,

5

12 (citing 25 P.S. §§ 3146.6(c), 3150.16(c)); *see also* SMF ¶¶ 53, 54.

Pennsylvania voters have embraced the expansion of mail-ballot voting.  In the 2022 general election, over 1.2 million Pennsylvanians voted by mail.  SMF ¶¶ 3, 35.

## B. Litigation Ensues Over the Envelope-Date Requirement

This case involves the Pennsylvania Election Code's instruction that a voter "shall … fill out, date and sign the declaration printed on [the return] envelope."  25 P.S. §§ 3146.6(a), 3150.16(a).  SMF ¶ 13.  The envelope-dating provision has been the subject of repeated litigation, including a unanimous Third Circuit panel decision holding that refusing to count a voter's ballot for failure to handwrite a date on the mail ballot envelope violates federal law.  SMF ¶ 14–21.

First, in 2020, the Supreme Court of Pennsylvania concluded, in a split 3-1-3 decision, that otherwise valid mail ballots contained in signed but undated Return Envelopes would be counted in the November 2020 election.  *In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1062 (Pa. 2020), *cert. denied*, *Donald J. Trump for President, Inc. v. Degraffenreid*, 141 S. Ct. 1451 (Mem.) (2021).  A majority of that court suggested (albeit without deciding) that invalidating votes for failure to comply with the envelope-dating provision "could lead to a violation of federal law by asking the state to deny the right to vote for immaterial reasons".  *Id.* at 1074 n.5 (opinion announcing the judgment); *id.* at 1089 n.54 (Wecht, J., concurring and dissenting).

Next, the issue arose in the November 2021 municipal elections.  In Lehigh County, 257 timely-received mail ballots were set aside based on mail ballot voters' inadvertent failure to handwrite a date on the Return Envelope.  *Migliori*, 36 F.4th

at 157.  Voters sued, and a unanimous Third Circuit panel ordered Lehigh County to count the votes.  *See Migliori*, 36 F.4th at 162–64; *see also id.* 164–66 (Matey, J., concurring).  The court concluded that because omitting the handwritten date on the Return Envelope was not "material in determining whether [a voter] is qualified to vote under Pennsylvania law," disenfranchising voters based on that omission violated the Materiality Provision.  *Id.* at 162–63; *id.* at 165 (Matey, J., concurring). The U.S. Supreme Court denied a stay of the Third Circuit's decision, after which the Lehigh County ballots were counted.  *See Ritter v. Migliori*, 142 S. Ct. 1824 (2022) (Mem).  The subsequent certification of the election, with every vote counted, mooted the controversy, and the Supreme Court later vacated the Third Circuit's decision as moot pursuant to *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), in a non-merits, short-form order.  *See Ritter v. Migliori*, 143 S. Ct. 297 (Mem.) (2022).

Issues around the envelope date also arose in the 2022 primary election.  In twin suits arising out of that election, the Commonwealth Court of Pennsylvania twice held that such mail ballots must be counted, concluding that "the failure of an elector to handwrite a date on the declaration on the return envelope does not relate to the timeliness of the ballot or the qualification of the elector."  *Chapman v. Berks Cnty. Bd. of Elections*, No. 355 M.D. 2022, 2022 WL 4100998, at *28 (Pa. Commw. Ct. Aug. 19, 2022); *see id.* at *12–*30; *McCormick for U.S. Senate v. Chapman*, No. 286 M.D. 2022, 2022 WL 2900112, at *9–*15 (Pa. Commw. Ct. June 2, 2022).

In the months leading up to the 2022 general election, the Secretary of the Commonwealth advised counties to count otherwise valid and timely-received mail

ballots even where voters omitted a handwritten date, or wrote a wrong date like a birthdate, on the Return Envelope form.  SMF ¶¶ 15–16.

On October 16, 2022, less than a week after the *Migliori* vacatur, and with voting in the 2022 general election underway, a group of party-affiliated petitioners brought a King's Bench petition in the Supreme Court of Pennsylvania, seeking to invalidate mail ballots with no handwritten date or an "incorrect" handwritten date on the Return Envelope.  SMF ¶ 17.  On November 1, 2022, the court, which now and at the time had only six justices, issued an order (the "*Ball* order") directing that such mail ballots should be segregated and not counted based on an interpretation of the Pennsylvania Election Code, but indicating that it was "evenly divided" on whether the federal Materiality Provision prohibited disenfranchising voters on that basis. SMF ¶ 18; APP_1147-48.  On November 5, the court issued a supplemental order stating that "incorrectly dated outer envelopes" include "(1) mail-in ballot outer envelopes with dates that fall outside the date range of September 19, 2022 through November 8, 2022; and (2) absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022 through November 8, 2022." SMF ¶ 21.  The court apparently selected the September 19 date based on the earliest date on which some county election boards began sending mail ballot materials to voters.  APP_1285.

### C. Thousands of Pennsylvanians Are Disenfranchised in the 2022 General Election Based on the Envelope Date Requirement

In the 2022 general election, which involved elections for U.S. Senate, U.S. House of Representatives, and the Pennsylvania General Assembly, the county boards of elections segregated and refused to count thousands of timely-received mail

ballots cast by registered and eligible voters based on missing or purportedly incorrect handwritten dates on the Return Envelopes.  SMF ¶¶ 33, 36–39.  In all, the county boards of elections set aside at least 10,506 voters' ballots on this basis.  SMF ¶ 36.  The affected voters are Democrats, Republicans, and Independents alike.  SMF ¶ 44.  They hail from 65 counties across the Commonwealth, from Philadelphia to Erie and everywhere in between.  SMF ¶ 36.  Their ages range from 18 to at least 101 years old.  SMF ¶ 45.

Five affected voters are the individual Plaintiffs in this case:  Laurence Smith, a 78-year-old retired entrepreneur who has been voting his entire adult life, SMF ¶ 22; Joel Bencan, a 71-year-old retired pharmacist who has been voting since the Nixon Administration, SMF ¶ 23; Aynne Polinski, a 71-year-old artist and regular voter, SMF ¶ 24; Marlene Gutierrez, a 64-year-old travel agent who has been voting since she was 18, SMF ¶ 25; and Barry Seastead, a 68-year-old retired welder from Warren County who has been voting for decades, SMF ¶ 26.

It is undisputed that every single one of the more than ten thousand voters whose votes were set aside for envelope-dating issues was eligible and registered to vote.  SMF ¶ 42.  Their mail ballot applications were all approved by their county boards of elections, which confirmed their identities and their eligibility.  SMF ¶ 42, *see also* SMF ¶¶ 4–6.  They all filled out their ballots at the proper time, which by law is "any time" after receiving the mail ballot package.  SMF ¶¶ 10, 37–39, 53.  They all timely returned their ballots by 8 p.m. on Election Day.  SMF ¶¶ 37–39, 54.

The record, including admissions, depositions, and expert testimony, confirms

that the handwritten envelope date lacks any purpose related to a voter's qualifications.  In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the Return Envelope for any purpose related to determining or confirming the mail ballot voter's age, citizenship, county or duration of residence, or incarceration status. SMF ¶¶ 47–50.  Nor did the defendants use the handwritten date on the Return Envelope containing a mail ballot to establish whether they received the ballot by 8 p.m. on November 8, 2022.  SMF ¶¶ 51–52.  Indeed, it is undisputed that a voter whose mail ballot was timely received by their county board of elections could *only* have signed the voter declaration form in the time period between the date that their county boards of elections sent mail ballot packages to voters (*i.e.*, in September or October 2022) and the deadline by which their ballots must have been received (8 p.m. on November 8, 2022).  SMF ¶¶ 53–55.  It is literally impossible for a voter to have signed the form at any other time. SMF ¶¶ 53–55, 73.

None of the county boards of elections identified any fraud concerns with respect to such ballots that were set aside due to a missing or "incorrect" envelope date.  SMF ¶ 43.  Two counties pointed to an incident from the 2022 primary, in which one individual apparently forged her deceased mother's signature on a mail ballot envelope form, *e.g.*, SMF ¶ 60, but an official from the county where the incident occurred admitted that the deceased voter had already been removed from the voter rolls before her ballot had even been received, and her vote would never have been counted regardless of the handwritten date on the Return Envelope, APP_890–0891.

Indeed, it is undisputed that, when a voter dies before Election Day, their vote is set aside and not counted regardless of any handwritten date.  SMF ¶¶ 61-64.

The record further shows the envelope date rule was arbitrarily and inconsistently applied, especially with respect to purportedly "incorrect" dates.

For example, counties refused to count many ballots where voters wrote an envelope date that was actually correct.  In some cases, counties appear to have just made a mistake, setting aside at least 47 ballots with envelope dates that were plainly within the range of the *Ball* order.  SMF ¶ 97.  Counties similarly set aside at least 12 ballots where the voter wrote a "correct" date, but put it in the wrong place on the envelope.  SMF ¶ 83.  Many counties also refused to count ballots where the envelope date was correct but missing one term, such as "10 - - 2022," or "Oct. 25,"  SMF ¶¶ 71, 76, 80, while others counted such ballots, for example because all of October fell within the "correct" date range set forth by the *Ball* order, SMF ¶¶ 72, 81.  In all, discovery revealed at least 103 voters were disenfranchised on this basis.  SMF ¶¶ 71, 76, 80.  Counties also took varying approaches to dates that appeared to use the international format (*i.e.*, day/month/year).  SMF ¶¶ 86–88.  Some counties purported to count ballots with international format envelope dates, but admitted that they did so inconsistently.  SMF ¶ 87; *see* APP_0929a–0929b, 0929m–929n.  Others conceded they did not accept ballots where the envelope date was in the international format. SMF ¶ 86.  Overall, at least 34 ballots were set aside even though the envelope date was correct under the international date format. SMF ¶ 88.

At the same time, a number of counties ended up *counting* ballots with

envelope dates that were obviously wrong.  At least eleven counties deemed envelope dates to be "correct" under *Ball* even when a voter wrote a date that occurred before the county had actually sent the mail ballot package to voters.  SMF ¶¶ 26, 39, 91–93.  Some counties counted ballots where the voter wrote an envelope date that was necessarily wrong because it occurred after the board of elections had already received and time-stamped the envelope.  SMF ¶ 94.[3]  At least one county counted a ballot that was marked September 31—a date that cannot be right *because it does not exist*.  SMF ¶¶ 78–79.

Counties also took inconsistent approaches to birthdates, with at least one county counting mail ballots where the voter wrote their birthdate on the envelope, while most others refused to do so.  SMF ¶¶ 68–69.  Overall, at least 50 ballots were set aside because the voter mistakenly wrote their birthdate.  SMF ¶ 68.

More broadly, counties refused to count hundreds of ballots (at least 1,734 in all) with obviously unintentional slips of the pen (such as a voter writing "2021," or "2033," or "2201" instead of "2022," or writing "10/111/2022" instead of "10/11/2022").  SMF ¶¶ 67, 70, 74, 75, 77.  At the same time, county officials admitted that it was literally impossible for a voter to have signed the mail ballot envelope for the 2022 general election in 2021, or two centuries in the future in the year 2202, or on their birthday decades ago.  *E.g.*, SMF ¶ 65.  Indeed, in examining envelopes that had been set aside, county officials were often easily able to recognize a voter's mistake.  For example, one voter wrote "10/23/2033" on their mail ballot envelope, leading to their

---

[3] Other counties refused to count such ballots, even though voters wrote an envelope date that was within the *Ball* range.  SMF ¶ 95.

disenfranchisement for mistakenly writing "33" instead of "22." APP_1432. The ballot was date-stamped by their county board of elections on October 25, 2022. APP_1432. Asked whether he had "any doubt that this voter was trying to write 10/23/2022" on the Return Envelope form, the county's chief election official responded, "I agree." APP_0929n–0929o. The record is replete with similar examples of envelopes that were clearly signed, dated and submitted within the "correct" window and then date-stamped confirming receipt a few days later, only to be set aside due to a slip of the hand. *E.g.*, SMF ¶¶ 67, 70, 74, 75, 77.

### D. Disenfranchised Voters and Non-Partisan Groups File This Action

In the days preceding the November 2022 election, Plaintiffs—both individual voters and nonpartisan organizations dedicated to promoting democracy and civic engagement—filed this lawsuit, naming as defendants the Secretary of the Commonwealth and all 67 County Boards of Elections. Various party-affiliated entities later intervened to defend the disenfranchisement of Pennsylvania voters.

For relief, the individual voters sought a declaration and nominal damages, as well as to have their ballots opened, counted, and reflected on the counties' online and paper records of the total votes in the November 2022 election. *See* ECF No. 121 at 38. The counties maintain such online and paper records of the vote tallies for past elections, and are able to update them if ordered to do so. SMF ¶¶ 112-114. Meanwhile, the organizational plaintiffs—who scrambled to prevent voters who had already cast their mail ballots from being disenfranchised—sought an order enjoining the disenfranchisement of voters in future elections based on this immaterial paperwork error. *See* ECF No. 121 at 38. In the November election, plaintiff

organizations were forced to divert resources, including significant amounts of volunteer time, from engaging new voters to educating mail ballot voters who had already voted and helping them to cure the envelope-date issue in those counties where voters were provided with notice and the opportunity to cure.  SMF ¶ 27–32. Among other things, plaintiff organizations placed thousands of calls and texts to affected mail ballot voters in the days after the *Ball* order issued.  SMF ¶ 27–32.  They will be required to commit resources to such post-hoc harm-reduction efforts again, in election after election, unless and until the unlawful practice of disenfranchising voters based on an immaterial paperwork error is enjoined.  SMF ¶ 27–32.

## ARGUMENT

Summary judgment is proper and "shall" be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).  The summary-judgment stage "is essentially 'put up or shut up' time for the non-moving party," which "must rebut the motion with facts in the record."  *Id.* To avoid summary judgment, the non-moving party must show that "a disputed fact exists which might affect the outcome of the suit under the controlling substantive law."  *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003) (citation omitted)).

No such disputed fact exists on this record.

## I.   PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR MATERIALITY PROVISION CLAIM

### A. The Materiality Provision Prohibits Disenfranchising Voters Based on Inconsequential Paperwork Errors

The Materiality Provision prohibits denying "the right of any individual to vote

in any election" based on an "error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).  In plain terms, it applies where a state actor denies a person's right to vote based on a minor error or omission on voting-related paperwork, where that error is unrelated to ascertaining a voter's qualifications to vote in the election at hand.  *Id.*; *see also, e.g.*, *Migliori*, 36 F.4th at 162, 164; *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1175 (11th Cir. 2008); H.R. Rep. No. 88-914 (1963), *reprinted at* 1964 U.S.C.C.A.N. 2391, 2491 ("state registration officials" must "disregard minor errors or omissions if they are not material in determining whether an individual is qualified to vote").  The statute prevents states from "requiring unnecessary information" on voting-related paperwork for voters to have their votes counted, *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003), and prohibits "state election practices that increase the number of errors or omissions on papers or records related to voting and provide an excuse to disenfranchise otherwise qualified voters."  *E.g.*, *League of Women Voters of Ark. v. Thurston*, No. 20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021).

Congress initially codified the Materiality Provision as part of the 1964 Civil Rights Act, in response to the practice of Black voters' registrations being rejected for "minor misspelling errors or mistakes in age or length of residence," or other "trivial reasons" in filling out the requisite forms.  H. Rep. No. 88-914 at 2491; *see also Schwier*, 340 F.3d at 1294.  For example, the statute was "necessary to sweep away

such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age." *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995).

But while the law's immediate aim involved addressing disenfranchisement in the Jim Crow South, Congress crafted the statute in race-neutral terms, to provide a broader prophylactic against unfair disenfranchisement based on trivial paperwork mistakes, the better to protect the fundamental right to vote for all. *See Browning*, 522 F.3d 1153, 1173 (explaining that, "in combating specific evils," Congress may nevertheless "choose a broader remedy").

Courts have repeatedly held that denying the right to vote for failure to complete some extraneous or duplicative paperwork requirement violates the Materiality Provision—including in the mail ballot context. For example, in *Martin v. Crittenden*, a district court held that plaintiffs were likely to succeed in their argument that rejecting mail ballots, based on the omission of a voter's year of birth from a form on the outer return envelope, violated the Materiality Provision. 347 F. Supp. 3d 1302, 1308–09 (N.D. Ga. 2018); *see also Thurston*, 2021 WL 5312640, at *4 (denying motion to dismiss where voters challenged state law requiring absentee voters to submit duplicative proofs of name, address, date of birth, and registration status). Courts have applied the same rule to in-person voting: In *Ford v. Tennessee Senate*, a district court held that voters' ballots could not be set aside because voters had not met an unnecessary "technical requirement" to sign *both* a ballot application form and a poll book. No. 06 Civ. 2031, 2006 WL 8435145, at *7, *10-11 (W.D. Tenn. Feb. 1, 2006). And of course, in *Migliori*, the Third Circuit unanimously held that

disenfranchising Pennsylvania voters based on the precise envelope-date rule at issue here violated the Materiality Provision.  36 F.4th at 162–66.

Nothing has changed since *Migliori*.  Here, the disenfranchisement of thousands of Pennsylvanians in the November 2022 election, based solely on an omitted or ostensibly "incorrect" handwritten date on the mail ballot envelope form, violates the statute as a matter of plain text.  As explained below, and on the undisputed facts in the record, thousands of Pennsylvanians were

- "den[ied] the right … to vote" (in that their ballots were not "counted and included in the appropriate totals of votes cast," 52 U.S.C. § 10101(a)(2)(B), (a)(3), (e));

- based on an "error" or "omission" (namely, leaving off or incorrectly inputting the handwritten date on the mail ballot Return Envelope form);

- on a "record or paper" that is related to an "act requisite to voting" (namely, the form declaration printed on the Return Envelope, which the counties required voters to complete to have their ballots canvassed and counted);

- that is immaterial to whether the voter "is qualified under State law to vote in [the] election" or for that matter on whether the mail ballot was timely received (namely, because the handwritten date on the envelope has no bearing at all on whether a voter is qualified to vote or has voted timely).

52 U.S.C. § 10101(a)(2)(B).

The statute precisely fits the facts of this case.

## B. On the Undisputed Facts in the Record, Defendants Violated the Materiality Provision

### i. Pennsylvania voters were denied the right to vote…

The Materiality Provision expressly defines voting in capacious terms, as

17

including "all action necessary to make a vote effective including, but not limited to … casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast."   52 U.S.C. §§ 10101(a)(3)(A), 10101(e).   For purposes of the Materiality Provision, the right to vote "by definition includes not only the registration and eligibility to vote, but also the right to have that vote counted." *Ford*, 2006 WL 8435145, at *11; *see also Migliori*, 36 F.4th at 164 (refusing to count mail ballots due to omitted handwritten envelope dates would mean impermissibly "denying [v]oters their right to vote")

Here, there is no genuine dispute that the defendant county boards, acting under color of law, refused to count thousands of voters' ballots based on the envelope-date issue.  *See* SMF ¶¶ 36–39.  Those ballots were not included in the totals of votes cast in the 2022 election.  *See* SMF ¶¶ 36–39.  The uncounted ballots include votes cast by the individual plaintiffs in this case, as well as thousands of others.  SMF ¶¶ 27–32, 36–39.  Under the definition set forth by Congress in the statutory text, Plaintiffs have conclusively established an actionable denial of the right to vote.[4]

### ii.    … based on an "error or omission" on a "record or paper relating to … [an] act requisite to voting" …

There is also no genuine dispute that defendants denied voters' right to vote

---

[4] In discovery, a few defendants asserted that, as a legal or semantic matter, refusal to count voters' votes does not amount to denial of the right to vote, but none disputed that they refused to count ballots in the basis of the envelope-date issue, *see* SMF ¶¶ 36–39.  In any case, these defendants' position fared poorly under scrutiny.  In one striking example, a county official testified that there would be no denial of the right to vote even if voters' ballots were not counted due to a failure to correctly list their age in days on the mail ballot return envelope—an example that mirrors one of the infamous Jim Crow-era rules that the Materiality Provision was designed to eradicate.  *Compare* APP_919c *with Condon*, 913 F. Supp. at 950.

based on an immaterial "error or omission" on "any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). This aspect of the statute is satisfied as well.

Defendants do not dispute that the reason that they set aside and refused to count the thousands of ballots at issue here is because the voter either did not include the handwritten date on the return envelope form (an "omission") or else they wrote a date that was deemed to be incorrect (an "error") because it appeared to be outside a date range selected by the Pennsylvania Supreme Court (*i.e.*, September 19, 2022 through November 8, 2022). *See* SMF ¶¶ 37–39. Thousands of ballots were set aside and not counted solely on this basis. *See* SMF ¶¶ 36–39.

Nor is there any basis for a genuine dispute that this "error or omission" was on a "record or paper relating to any application, registration, or other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B); *see also Migliori*, 36 F.4th at 163 n. 56. The error or omission at issue here occurred on a form printed on the mail ballot return envelope, *see* SMF ¶¶ 13, 46—*i.e.*, a "paper." Counties required mail ballot voters to complete the envelope form in order to have their votes counted, *see* SMF ¶ 13, 36—*i.e.*, they made completing the form, including providing an immaterial handwritten date, "requisite to voting," 52 U.S.C. § 10101(a)(2)(B).

### iii.   ... that is "not material in determining whether such individual is qualified under State law to vote in such election."

There is also no genuine dispute that the voter-written date on the mail ballot envelope is not used in any way to determine an individual's qualification to vote.

In considering whether a particular error or omission is "material in

determining whether such individual is qualified under State law to vote in such election," 52 U.S.C. § 10101(a)(2)(B), courts generally look to the qualifications to vote as set forth in state law. *See Migliori*, 36 F.4th at 162–64; *La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 540 (W.D. Tex. 2022); *Martin*, 347 F. Supp. 3d at 1308-09; *Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270 (W.D. Wash. 2006); *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006); *see also Browning*, 522 F.3d at 1175 (issue is "whether, accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant").

In Pennsylvania, the "qualifications" to be entitled to vote are age, citizenship status, duration of residence in the district, and felony incarceration status. SMF ¶ 4; *see* 25 Pa. C.S. § 1301(a); *Migliori*, 36 F.4th at 163–64. There is no dispute that the envelope-dating requirement bears no relationship to any of these. Every county acknowledged that the envelope date is not used to determine a voter's age, SMF ¶ 47, or their citizenship status, SMF ¶ 48, or their county of residence, SMF ¶ 49, or their felony incarceration status, SMF ¶ 50. Intervenors conceded the point as well, admitting that the envelope date "is not material to any individual's qualifications." *E.g.*, ECF No. 194 at 12.[5] The record conclusively demonstrates that nothing about a date written on the Return Envelope has any bearing on a voter's qualifications. Rather, a voter's qualifications are confirmed by the counties when a voter registers and again when they apply for a mail ballot. SMF ¶¶ 4–7; *see Martin*, 347 F. Supp.

---

[5] Plaintiffs addressed Intervenors' various, meritless legal arguments regarding the Materiality Provision in opposing Intervenors' motion to dismiss, ECF No. 228.

3d at 1309 (granting relief where "the qualifications of the absentee voters" were "not at issue because elections officials have already confirmed such voters' eligibility ....").

The record also establishes that the handwritten date has nothing to do with whether a ballot was timely voted or timely submitted.  There is no dispute that a voter cannot vote their mail ballot until they have received the mail ballot package. SMF ¶ 53.  There is no dispute that, once they have received the mail ballot package, a voter can fill out their ballot, sign the form, and return it at "any time" prior to 8 p.m. on Election Day.  SMF ¶ 10; 25 P.S. §§ 3146.6(a), 3150.16(a).  There is no dispute that whether the ballot was returned on time depends on when the board of elections received the mail ballot.  SMF ¶ 11, 54.  If the ballot is received by 8 p.m. on Election Day, it is timely, *regardless of any date written on the form on the Return Envelope.* SMF ¶ 11, 51–52, 54; 25 P.S. §§ 3146.6(c), 3150.16(c).  The boards independently time-stamp or mark the envelopes to confirm their timeliness.  SMF ¶ 12.  "Backdating" the envelope can *never* render an untimely-received ballot timely.  SMF ¶ 55.

Nor does the voter-written envelope date perform any other function that might render it material under the statute.  In discovery, some counties contended that the envelope date might play some role with respect to voters who die before Election Day.  But no defendant disputed that, consistent with state law, a voter who dies before Election Day will not have their mail ballot counted, *regardless of any date written on the mail ballot return envelope.*  SMF ¶¶ 61–64.

The arbitrariness and inconsistency that resulted from enforcement of the envelope date rule demonstrates just how utterly immaterial the envelope date is.  If

the content of the date mattered, it would be problematic to disenfranchise voters who wrote *correct* dates—yet numerous counties did so, refusing to count ballots because the handwritten envelope date listed only the day and month (e.g., "Wednesday Oct. 26," SMF ¶ 71), or the month and the year (e.g., "10 -  - 2022," SMF ¶ 80), or was written in an international format (e.g., "06/10/2022," SMF ¶¶ 86, 88). Some counties even refused to count mail ballots where the voter wrote the wrong date, crossed it out, and then wrote the correct one.  SMF ¶¶ 84, 97.

If the content of the envelope date mattered, then it would also be problematic to *count* ballots where the voter-written date was necessarily *wrong*.  Yet some counties did that too, deeming "correct" envelope dates that were earlier than the period when the county began sending out mail ballot packages to voters, SMF ¶¶ 26, 39, 91–93, or dates that were later than the board of elections' own time-stamp, SMF ¶ 94, or dates like September 31 that simply do not exist, SMF ¶ 78–79.

In fact, county officials admitted that the content of the handwritten date did not matter in determining when a person actually voted.  They admitted that it was literally impossible for a voter to have completed their mail ballot months or years or decades before the mail-ballot packages were sent to voters by their county boards of elections, regardless of what the voter-written date on the envelope might say due to a voter misprint or error.   SMF ¶¶ 53, 55.  They admitted that it was literally impossible for a voter to have completed their mail ballot some time years or decades in the future, regardless of whether the voter slipped up and wrote "2023" or "2033" or "2202" on the envelope.  SMF ¶¶ 53, 55, 65.  They admitted that, whatever date a

voter did or did not write on the Return Envelope, the only possible time that they could have signed and completed the mail ballot package was between the day they received it from the board of elections and Election Day.  SMF ¶ 73.[6]

The disenfranchisement of thousands of Pennsylvania voters, based on a paperwork mistake that indisputably has no bearing on their qualifications, the timeliness of their ballot, or the validity of their votes, is a textbook violation of the Materiality Provision.  Plaintiffs' motion should be granted.

## II.  PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR FOURTEENTH AMENDMENT CLAIM.

Federal courts should "avoid deciding a constitutional question if the case may be disposed of on some other basis," for example statutory grounds.  *E.g.*, *Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 102 (3d Cir. 2008).  Here, granting Plaintiffs' motion on statutory grounds will allow the Court to avoid resolving a constitutional problem, namely, the unequal treatment of identically-situated voters.

The Equal Protection Clause requires that similarly situated voters be subject to the same basic rules.  *E.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  Voters therefore "cannot be restricted or treated in different ways without substantial justification from the state."  *Obama for Am. v. Husted*, 888 F. Supp. 2d 897, 905-06 (S.D. Ohio), *aff'd*, 697 F.3d 423 (6th Cir. 2012).[7]  *Husted* directly applied this principle

---

[6] Notably, federal courts reject arguments that a missing or incorrect date deprives documents of their legal effect.  For example, federal courts overwhelmingly hold that "the absence of a date [on declarations under 28 U.S.C. 1746] does not render them invalid if extrinsic evidence could demonstrate the period when the document was signed."  *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475–76 (6th Cir. 2002).

[7] Because the right to vote is at stake here, the unequal treatment of voters should

to differential treatment of domestic versus overseas (also-called UOCAVA[8]) voters, challenging an Ohio law that set different early voting periods for in-state versus UOCAVA voters.  697 F.3d at 435.  The Sixth Circuit held that, for purposes of the availability of in-person early voting, "there is no relevant distinction between the two groups" of voters, and "there is no reason to provide [domestic] voters with fewer opportunities to vote than military voters."  *Id.*  On remand, the district court granted summary judgment to plaintiffs, holding that the challenged statute was "unconstitutional to the extent it treats UOCAVA voters more favorably than non-UOCAVA voters with regard to in-person early voting."  *Obama for Am. v. Husted*, No. 12-cv-636, 2014 WL 2611316, at *4 (S.D. Ohio June 11, 2014).

If the Court reaches the issue, the same result should obtain here.  State law appears to treat domestic and overseas mail ballot voters differently.  Domestic voters are required to write a "correct" date on the Return Envelope form on pain of disenfranchisement.  *E.g.*, SMF ¶ 36.  But for overseas voters, state law specifically provides that a "voter's mistake or omission in the completion of a document shall *not* invalidate their ballot as long as the mistake or omission does not prevent determining whether a covered voter is eligible to vote."  25 Pa. C.S. § 3515(a)).  At least three counties accepted overseas ballots where voters omitted any date from the

---

be subject to exacting review.  *E.g.*, *United States v. Williams*, 124 F.3d 411, 422 (3d Cir. 1997).  But in all events, the undisputed facts showing blatant and unjustified unequal treatment, and accordingly Plaintiffs prevail under any standard.

[8] UOCAVA stands for Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq.*, a law that ensures mail ballot options for Americans abroad.

analogous, accompanying form for overseas mail ballots, but refused to count the ballots of domestic mail ballot voters based on the same exact error.  SMF ¶ 108.

Here, as in *Husted*, there is "no relevant distinction" between the two groups of voters with respect to the requirement to write a date on a form accompanying the mail ballot.  697 F.3d at 435.  If anything, the date should be *more* important in the context of overseas voters, whose ballots may be timely received *after* Election Day so long as they were sent prior to Election Day.  *See* 25 Pa. C.S. §§ 3509, 3511.  Yet in at least some counties, overseas voters were not disenfranchised due to the date requirement, while domestic mail ballot voters were.  There is nothing in the record to justify this disparate treatment of Pennsylvanians' voting rights.  The Court need not reach this Equal Protection issue—but if it does, plaintiffs are entitled to judgment on that basis as well.

## CONCLUSION

Plaintiffs' motion for summary judgment should be granted.

Dated: April 21, 2023

Respectfully submitted,

/s/ Ari J. Savitzky

Witold J. Walczak (PA 62976)
AMERICAN CIVIL LIBERTIES UNION OF
PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
Tel: (412) 681-7736
vwalczak@aclupa.org

Marian K. Schneider (PA 50337)
Stephen Loney (PA 202535)
Kate I. Steiker-Ginzberg* (PA 332236)
AMERICAN CIVIL LIBERTIES UNION OF
PENNSYLVANIA
P.O. Box 60173

Ari J. Savitzky
Megan C. Keenan
Luis Manuel Rico Román
Sophia Lin Lakin
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
asavitzky@aclu.org
mkeenan@aclu.org
lroman@aclu.org
slakin@aclu.org

Philadelphia, PA 19102
mschneider@aclupa.org
sloney@aclupa.org

David Newmann (PA 82401)
Brittany C. Armour (PA 324455)
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel: (267) 675-4610
david.newmann@hoganlovells.com
brittany.armour@hoganlovells.com

Elizabeth Femia
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Tel: (212) 918-3813
lisa.femia@hoganlovells.com

\* *Appearance forthcoming*

acepedaderieux@aclu.org

*Counsel for the Pennsylvania State
Conference of the NAACP, League
of Women Voters of Pennsylvania,
Philadelphians Organized to
Witness, Empower and Rebuild,
Common Cause Pennsylvania,
Black Political Empowerment
Project, Make the Road
Pennsylvania, Barry M. Seastead,
Marlene G. Gutierrez, Aynne
Margaret Pleban Polinski, Joel
Bencan, and Laurence M. Smith*